## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. PAULINE EDDY, Individually and as Personal Representative for the Estate of Sharon Eddy, deceased,<br><br>Plaintiff,<br>v.<br><br>1. BRICKTOWN HOSPITALITY, LLC d/b/a SPRINGHILL SUITES BY MARRIOTT DOWNTOWN/BRICKTOWN;<br>2. ASTON MANAGEMENT COMPANY;<br>3. MARRIOTT INTERNATIONAL, INC.; and<br>4. EMPLOYEES JOHN DOE 1 THROUGH 20,<br><br>Defendants. | Case No. ___CIV-18-1051-SLP___ |

## COMPLAINT

COMES NOW, Plaintiff Pauline Eddy, individually, and as personal representative of the Estate of Sharon Eddy, and for her claims against Defendants Bricktown Hospitality, LLC d/b/a SpringHill Suites by Marriott Downtown/Bricktown, Aston Management Company, Marriott International, Inc. and Defendant Employees John Doe 1 through 20, states as follows:

## PARTIES

1.      Plaintiff, Pauline Eddy, is the Personal Representative of the Estate of Sharon Eddy, deceased, having been duly appointed by the Twelfth Judicial District Court in Otero County, New Mexico, on March 6, 2018, in a cause of action styled as D-1215-PB-2018-00002. Pauline was at all times material hereto the mother of the decedent.  Additionally,

because Sharon was not married and had no children at the time of her death, Pauline, as Sharon's mother, is Sharon's next of kin.  Presently, Pauline is domiciled in the State of Arizona and is a citizen of the United States.

2.      Defendant Bricktown Hospitality, LLC d/b/a SpringHill Suites by Marriott Downtown/Bricktown (hereinafter "Bricktown"), is, and was at all times pertinent to this action, a limited liability company organized under the laws of the State of Oklahoma and with its principal place of business in Oklahoma County, Oklahoma. During the relevant time period, Bricktown was doing business as, owned, and operated the SpringHill Suites by Marriott Downtown/Bricktown, a SpringHill Suites-brand franchise hotel facility at 600 East Sheridan Ave., Oklahoma City, Oklahoma (hereafter "Bricktown SpringHill Suites").

3.      Defendant Aston Management Company (hereinafter "Aston") is, and was at all times pertinent to this action, a for profit business corporation organized under the laws of the State of Oklahoma with its principal place of business in Oklahoma County, Oklahoma.  Aston is a hotel management services company, and at all times material hereto, Aston acted as the operator and manager of the Bricktown SpringHill Suites.

4.      Defendant Marriott International, Inc., (hereinafter "Marriott") is, and was at all times pertinent to this action, a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of Maryland, and with a registered agent in the State of Oklahoma. At all times material hereto, Marriott was engaged in the business of operating, and issuing franchises to operate, hospitality properties under the registered trademark and tradename of SpringHill Suites at various places in Oklahoma and throughout the United States. Accordingly, Marriott has an

ownership and management interest in the name, franchise, and property of the Bricktown SpringHill Suites.

5.    Defendant Employees John Doe 1 through 20 (hereinafter "Defendant Employees") are employees of Bricktown and/or Aston. The true names and capacities of Defendant Employees are unknown to Plaintiff at this time, and Plaintiff has accordingly sued these unknown Defendants under their fictitious names. When the true names of Employees John Doe 1 through 20 have been ascertained, Plaintiff will seek leave to amend the Complaint accordingly. Plaintiff is informed and believes that Defendant Employees are at least in part legally responsible for the events and occurrences described, and that Defendant Employees caused injuries and damages to Plaintiff.

**JURISDICTION AND VENUE**

6.    Plaintiff is a resident of the State of Arizona for purposes of establishing diversity jurisdiction. At the time of the incident, Plaintiff was a resident of the State of New Mexico.

7.    The incidents described herein occurred at the premises of the Bricktown SpringHill Suites.

8.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 as Plaintiff is not a citizen of the same state as any of the Defendants and the amount in controversy, exclusive of interests and costs, exceeds $75,000.00.

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## **FACTUAL ALLEGATIONS**

10.     Sharon Eddy was a healthy, sixty-one (61) year old woman residing in Alamogordo, New Mexico. Since the passing of her father in 1999, Sharon was responsible for running her family's business, The Winner's Circle, a retail company and clothing store in Alamogordo, New Mexico. The business provided financial support and employment for Sharon, her sister and various other family members.  Additionally, income from The Winner's Circle provided financial support to Sharon's mother, Pauline Eddy, Plaintiff herein, over the years.

11.     In addition to the financial relationship, Sharon and Pauline enjoyed a warm, close family relationship and friendship, and after Sharon's father died, Pauline became especially dependent upon Sharon for maintenance, companionship, society, and services. Sharon looked after her mother, took her mother to doctor's appointments, and otherwise ensured the safety and security of her mother.

12.     On November 17, 2017, Sharon and Pauline drove together from Alamogordo, New Mexico to Oklahoma City, Oklahoma to attend a family wedding in Oklahoma City.

13.     As they often did on their travels together, Sharon and Pauline chose to stay at a Marriott hotel – the Bricktown SpringHill Suites.

14.     Defendants Bricktown and Marriott owned and operated, and Defendant Aston managed, the Bricktown SpringHill Suites. This hotel included an in-house bar, offering beer, wine, and liquor for sale, to serve and attract its guests.

15.     Sharon and Pauline, a single woman and a widow respectively, frequently sought out Marriott-branded hotels on their travels because of Marriott's reputation for safety and security.

16.     Upon arriving in Oklahoma City that evening, Sharon and Pauline found the Bricktown SpringHill Suites to appear very similar to other Marriott properties at which they had stayed: i) extensive signage outside the hotel and in the public areas promoted the fact that the hotel was a SpringHill Suites/Marriott; ii) disposable items such as napkins, ballpoint pens, paper cups and the like all indicated that the hotel was a SpringHill Suites/Marriott; iii) amenities in the room such as toiletries were branded as SpringHill Suites/Marriott; iv) the in-room telephone had a placard that indicated the hotel was a SpringHill Suites/Marriott; v) the in-room guide which recommended nearby restaurants and attractions also promoted the property as being a SpringHill Suites/Marriott; and vi) the television had a SpringHill Suites/Marriott splash/welcome screen when turned on.

17.     Additionally, upon Sharon's and Pauline's arrival, all of the employees at the Bricktown SpringHill Suites wore uniforms that contained the words "Marriott" and/or "Springhill Suites" or wore business dress clothes upon which were affixed "Marriott" and/or "Springhill Suites" nametags. None of the uniforms or nametags worn by the employees indicated that the employee was in any way affiliated with Bricktown or Aston.

18.     A reasonable person would be unaware that the hotel was not owned and operated by Marriott directly but instead was franchised by Bricktown and managed by Aston and would not be on notice to inquire.

19.     Pauline and Sharon were unaware that they were dealing, at least in part, with Bricktown and Aston and instead thought they were dealing directly, solely and exclusively with Defendant Marriott.

20.     After checking in and settling in to their room that evening, Sharon asked Pauline if she wanted to accompany her to the hotel bar for drinks.  Pauline was tired from the long drive, and she asked Sharon to go ahead without her. Additionally, Pauline stayed behind in the room to await the arrival of her other daughter, adult granddaughter, and two great-grandchildren, whose arrival was ultimately delayed due to weather-related flight delays.

21.     When Sharon arrived at the hotel bar, she was sober. Pauline and Sharon had been travelling together the entire day, and Sharon did not consume any alcoholic beverages and was not impaired whatsoever at the time she headed downstairs to the in-house hotel bar.

22.     Defendant Employees attended to Sharon while she was at the hotel bar and sold, served, or otherwise provided alcoholic beverages to Sharon.

23.     Defendant Employees then continued to sell, serve, and otherwise provide alcoholic beverages to Sharon when they knew, or should have known, that she was extremely intoxicated, continuing to do so until they served her a lethal amount of alcohol.

24.     Sharon was overserved alcoholic beverages to the point of extreme alcohol intoxication such that she was obviously impaired, both physically and cognitively, was unable to stand or walk, was unable to effectively communicate, and was unaware and confused.

25.     Defendant Employees, with the conscious realization that Sharon was in danger, undertook to rescue Sharon from the dangerous situation that resulted from Defendant Employees' overserving alcoholic beverages to her.

26.     Defendant Employees collected a rolling office chair from elsewhere in the hotel, bringing said chair to the bar area where Sharon was in a stupor. Defendant Employees then maneuvered a highly intoxicated and immobile Sharon onto the office chair, then rolled her into the elevator, from the elevator through the fifth-floor hallway, entering Sharon and Pauline's room using a key. As they did not knock first, it appears that the employees were unaware that Sharon was sharing a room with her mother.

27.     When the employees entered the room with Sharon, Pauline was already in bed and was watching television.

28.     As Defendant Employees rolled Sharon into the room, they were laughing and carrying on as though Sharon's condition and the number of alcoholic beverages she had been served was of no concern.

29.     Defendant Employees maneuvered Sharon from the rolling office chair onto the bed next to Pauline's bed, and left the room.

30.     Defendant Employees did not alert Pauline that Sharon was in a perilous situation or in physical danger and did not call emergency personnel to attend to Sharon.

31.     Pauline was unaware, and was not told, that Sharon had been served an amount of alcohol sufficient to have raised her blood alcohol to a lethal level, approximately four (4) times the legal limit for driving in the State of Oklahoma.

32.     Pauline fell asleep shortly after the Defendant Employees left the room.

7

33.     At approximately 2:00 a.m., Pauline's other daughter, Susan Eddy, arrived at the hotel with Susan's adult daughter and Susan's two young grandchildren. Susan, her daughter, and the children were sharing the suite, billed as accommodating six people, with Sharon and Pauline. Upon entering the room and settling in for the night, Sharon's sister laid down on the bed next to Sharon and immediately discovered something was wrong and that Sharon was unresponsive.

34.     Once the adults realized Sharon was not breathing, Pauline left the room with the children while Susan and her adult daughter immediately began performing CPR and making panicked calls to emergency personnel.

35.     As Pauline waited in the hall with the children, she was reminded of her husband's sudden passing from a heart attack, knowing that as each minute passed the hopes for Sharon being revived diminished. Pauline was terrified, shocked, and grief-stricken.

36.     Emergency personnel arrived, attended to Sharon, and confirmed that Sharon had died.

37.     The medical examiner's subsequent toxicology report noted Sharon's blood alcohol content was 0.30 g/dL (from the heart) and Sharon's vitreous alcohol content was 0.34 g/dL.

38.     The medical examiner identified Sharon's probable cause of death as acute ethanol toxicity, or what is more commonly known as alcohol poisoning.

## COUNT I: WRONGFUL DEATH – NEGLIGENCE
### (Against Defendant Employees)

39.     Plaintiff re-alleges and incorporates by reference the allegations made in Paragraphs 1 through 38 above as if fully set forth herein.

40.     Defendant Employees had a duty to use reasonable care in selling, serving and/or otherwise providing alcoholic beverages to Sharon.

41.     Defendant Employees breached this duty in any and/or all of the following particulars, to wit:

> A)     Selling, serving and/or otherwise providing a lethal amount of alcohol to Sharon;
>
> B)     Continuing to sell, serve and/or otherwise provide alcohol to Sharon after she began to show signs of intoxication;
>
> C)     Failing to devote proper time and attention to the amount of alcohol received by Sharon; and
>
> D)     Failing to recognize and appropriately respond to Sharon's level of intoxication and the dangers associated therewith.

42.     Defendant Employees' acts and/or omissions were the direct and proximate cause of Sharon's death due to a fatally elevated blood alcohol content.

43.     As a direct and proximate cause of the Defendant Employees' negligence which caused Sharon's death, the estate has incurred medical and hospital expenses, and funeral and burial expenses.

44.     As a direct and proximate cause of the Defendant Employees' negligence, Sharon suffered mental pain and anguish, immediately prior to her death, all to her damage and to the damage to her estate.

45.     Additionally, Defendant Employees' negligence directly and proximately caused Plaintiff, Pauline, to suffer a pecuniary loss of the value of Sharon's earnings for the balance of her lifetime, immense grief and emotional anguish, and the loss of Sharon's companionship, services, care, love, and affection, which were, and are, of great value to her.

46.     Defendant Employees' conduct rises to the level of willful, wanton, reckless, intentional, malicious, and/or in gross disregard of the rights of others for which they should be punished by an award to Plaintiff of exemplary and punitive damages in an amount sufficient to render the consequences of their conduct as an example to themselves and others.

## COUNT II: WRONGFUL DEATH – NEGLIGENCE IN VOLUNTARY RESCUE
### (Against Defendant Employees)

47.     Plaintiff re-alleges and incorporates by reference the allegations made in Paragraphs 1 through 46 above as if fully set forth herein.

48.     Defendant Employees voluntarily assumed, and subsequently breached, duties arising under the voluntary rescue doctrine.

49.     Under the "voluntary rescue doctrine," an actor owes a duty to a person who reasonably appears imperiled and incapable of adequately caring for herself if (a) the actor voluntarily takes charge of the helpless person intending to assist her in confronting the peril, and (b) the actor discontinues the assistance and leaves the helpless person in a worse position than before.

50.     After being overserved alcoholic beverages and reaching a dangerously high level of intoxication, Sharon reasonably appeared imperiled and incapable of adequately caring for herself. Sharon suffered from confusion and was unable to stand or walk. She was incapable of carrying herself to her hotel room and appeared helpless.

51.     To the extent they were not otherwise obligated to do so, Defendant Employees voluntarily undertook to effect Sharon's "rescue." To this end, Defendant Employees voluntarily took charge of Sharon in an effort to assist her, physically maneuvering Sharon onto a chair and rolling her from the hotel bar to the elevator, and from the elevator down the hall to her room.

52.     After delivering Sharon to her room, and unceremoniously dumping Sharon in her bed, Defendant Employees discontinued their assistance and left Sharon in a worse position than she was before. Specifically, they moved her from a highly visible common-area of the hotel amongst a crowd of other people and concealed her, helpless, in the darkened room where her mother was in bed without alerting Pauline to the seriousness of Sharon's situation or her need for immediate life-saving medical care. In so doing, Defendant Employees left Sharon in a worse position than before, preventing her from receiving any medical assistance and leaving her for dead.

53.     This conduct and their failure to exercise reasonable care breached the duty owed by the Defendant Employees to Sharon.

54.     This breach of duty by Defendant Employees directly and proximately caused Sharon's death resulting in the damages set forth in Paragraphs 43-45 above.

55.     Additionally, Defendant Employees' conduct rises to the level of willful, wanton, reckless, intentional, malicious, and/or in gross disregard of the rights of others for which they should be punished by an award to Plaintiff of exemplary and punitive damages in an amount sufficient to render the consequences of their conduct as an example to themselves and others.

### COUNT III: WRONGFUL DEATH – NEGLIGENCE *PER SE*
### (Against Defendant Employees and Defendant Bricktown)

56.     Plaintiff re-alleges and incorporates by reference the allegations made in Paragraphs 1 through 55 above as if fully set forth herein.

57.     Under the version of the Oklahoma Alcoholic Beverage Control Act in effect at the time Defendant Employees served lethal amounts of alcohol to Sharon, as well as the revised version of the act effective October 2018, it was an "unlawful act" for a person to sell, deliver or knowingly furnish alcoholic beverages to an intoxicated person. *See* 37 Okl.St.Ann. § 537(A)(2); 37A Okl.St.Ann § 6-101.

58.     Under the same authority, it was a crime in Oklahoma to sell, deliver or knowingly furnish alcoholic beverages to an intoxicated person. *See* 37 Okl.St.Ann § 538(G); 37A Okl.St.Ann § 6-121.

59.     The prohibited act of selling, delivering, and knowingly furnishing alcoholic beverages to an intoxicated person applies to both employees serving alcohol and the holder of the liquor license, in this case, Defendant Bricktown.

60.     Further, both versions of the act provide for revocation of the liquor license of any licensee who "knowingly sold alcoholic beverages or allowed such beverages to be

sold, delivered or furnished … to any person visibly intoxicated…." *See* 37 Okl.St.Ann §528(D)(1); 37A Okl.St.Ann § 2-148.

61.     Defendant Employees and Defendant Bricktown violated Oklahoma law when they continued to serve Sharon alcohol when it should have been clear to them that she was intoxicated.

62.     The Defendant Employees' and Defendant Bricktown's violation of Oklahoma law caused injury and damages to Sharon and to Pauline, the injuries suffered were of the type intended to be prevented by the applicable laws, and Sharon and Pauline are of the class intended to be protected by the applicable laws.

63.     Thus, Defendant Employees and Defendant Bricktown were negligent *per se*.

64.     The *per se* negligence of Defendant Employees and/or Defendant Bricktown in violating Oklahoma law was the direct and proximate cause of Sharon's death and the damages set forth in Paragraphs 43-45 above.

65.     Additionally, Defendant Employees' and Defendant Bricktown's conduct rises to the level of willful, wanton, reckless, intentional, malicious, and/or in gross disregard of the rights of others for which they should be punished by an award to Plaintiff of exemplary and punitive damages in an amount sufficient to render the consequences of their conduct as an example to themselves and others.

## COUNT IV: WRONGFUL DEATH – GROSS NEGLIGENCE
### (Against Defendant Employees)

66.    Plaintiff re-alleges and incorporates by reference the allegations made in Paragraphs 1 through 65 above as if fully set forth herein.

67.    Oklahoma Courts have acknowledged that where claims for negligence cannot lie for want of a duty, recklessness will still not be excused. Thus, even if an individual normally lacks a duty to an injured party, if that individual was reckless or grossly negligent that individual will still be liable for damages to a victim harmed by those reckless or grossly negligent acts.

68.    Gross negligence is statutorily defined as the "want of slight care and diligence."  It exists when a person acts or fails to act, with a conscious realization that injury is a probable, as distinguished from possible (ordinary negligence), result of such conduct.

69.    In this case, Defendant Employees' conduct exceeded the bounds of ordinary negligence in that they acted with a conscious realization that injury was a probable result of their conduct.  Specifically, Defendant Employees' conduct was grossly negligent when they: i) sold, served, or otherwise provided a deadly amount of alcohol to Sharon; ii) continued serving Sharon after she exhibited visible signs and symptoms of a dangerous level of intoxication; and iii) with a conscious realization that it was probable that Sharon would suffer injury as a result.

70.    Defendant Employees' gross negligence was the direct and proximate cause of Sharon's death and the damages set forth in Paragraphs 43-45 above.

71.    Additionally, Defendant Employees' conduct rises to the level of willful, wanton, reckless, intentional, malicious, and/or in gross disregard of the rights of others for which they should be punished by an award to Plaintiff of exemplary and punitive damages in an amount sufficient to render the consequences of their conduct as an example to themselves and others.

### COUNT V: RESPONDEAT SUPERIOR
**(Against Defendants Bricktown and Aston)**

72.    Plaintiff re-alleges and incorporates by reference the allegations made in Paragraphs 1 through 71 above as if fully set forth herein.

73.    Defendant Employees were agents and/or employees of Defendants Bricktown and/or Aston and were acting within the scope of their agency and/or employment at all relevant times.

74.    Accordingly, Defendant Employees' acts and omissions described in Counts I-IV above are the acts and omissions of Defendants Bricktown and/or Aston and Defendants Bricktown and/or Aston are vicariously liable for the same under the doctrine of *respondeat superior*.

75.    It just and proper that all liability for damages incurred as a result of the actions of Defendant Employees be imputed to and that judgment be entered accordingly against Defendants Bricktown and/or Aston.

### COUNT VI: WRONGFUL DEATH – NEGLIGENCE AS AN INNKEEPER
**(Against Defendants Bricktown and Aston)**

76.    Plaintiff re-alleges and incorporates by reference the allegations made in Paragraphs 1 through 75 above as if fully set forth herein.

15

77.    Defendant Bricktown is an innkeeper in that it provides overnight accommodations to guests as a business. Defendant Aston manages this inn-keeping business on behalf of Bricktown and thus is an innkeeper in its own right.

78.    As part of the hotel, an in-house hotel bar is operated by Defendants Bricktown and Aston, at least in part, as an amenity and convenience for their overnight guests.

79.    Defendants Bricktown and Aston, as innkeepers, have a special relationship with guests, and consequently, owe guests an elevated duty of care, including a duty to reasonably protect guests from harm, and are charged with a very high degree of care to protect guests against assaults, insults, and negligent acts of servants. This elevated duty of care is nondelegable, and therefore, an innkeeper may be held liable for the acts or omissions of its employees and contractors.

80.    Defendants Bricktown's and Aston's duties to reasonably protect its guests from harm included:

> A)    The duty to properly train and supervise their employees to (i) serve alcoholic beverages in accordance with the statutory and common law duties, (ii) identify and recognize signs of intoxication, (iii) appreciate and understand the physical dangers of serving numerous drinks within a brief period of time, and (iv) manage situations involving dangerous levels of alcohol intoxication and medical emergencies;
>
> B)    The duty not to sell, serve, or otherwise provide alcoholic beverages to their overnight guests who show visible signs of intoxication; and

16

C)      The duty to protect guests from unreasonable risk of physical harm, the duty to render first aid to their overnight guests and the duty to care for injured guests until they can be appropriately cared for by others.

81.     Defendants Bricktown and Aston breached their innkeeper-duties to Plaintiff when they failed to properly train and supervise their employees as set forth in Paragraph 77(A) above.

82.     Defendants Bricktown and Aston breached their innkeeper-duties to Sharon as an overnight guest when they served Sharon a lethal amount of alcohol.

83.     Defendants Bricktown and Aston breached their innkeeper-duties to Sharon when they failed to: (i) take reasonable action to protect Sharon from the unreasonable risk of physical harm, including harm that they created when they overserved Sharon alcohol; (ii) render first aid when they knew, had reason to know, and should have known that Sharon was ill or injured, and (iii) when they failed to care for Sharon until Sharon could be cared for by others. Rather, Defendants' agents and/or employees executed their plan to physically remove Sharon from the hotel bar on a rolling office chair and dump her in her hotel room without explaining to Pauline the grave condition Sharon was in.

84.     Defendants Bricktown's and Aston's breach of their inn-keeper duties to Sharon directly and proximately caused Sharon's death and the damages set forth in Paragraphs 43-45 above.

85.     Additionally, Defendants Bricktown and Aston's conduct rises to the level of willful, wanton, reckless, intentional, malicious, and/or in gross disregard of the rights

of others for which they should be punished by an award to Plaintiff of exemplary and punitive damages in an amount sufficient to render the consequences of their conduct as an example to themselves and others.

## COUNT VII: NEGLIGENCE; OSTENSIBLE AGENCY
### (Against Defendant Marriott)

86.     Plaintiff re-alleges and incorporates by reference that allegations made in Paragraphs 1 through 85 above as if fully set forth herein.

87.     At the time of the incidents set forth in Counts I-VI of this Complaint, Defendant Bricktown, as franchisee, operated a franchise of Defendant Marriott, as franchisor, under the registered trademark and trade name of SpringHill Suites.

88.     The Bricktown SpringHill Suites advertises itself as a "Marriott" hotel.

89.     Defendants Bricktown and Marriott are parties to a franchise agreement.

90.     The franchise agreement sets out certain standards for franchisees to maintain.

91.     These standards are for the benefit and protection of Defendant Bricktown's guests.

92.     Defendant Marriott, as franchisor, owed a duty to Defendant Bricktown's guests to ensure that Defendant Bricktown, as franchisee, instilled proper training and supervision in its employees. Specifically, Defendant Marriott had a duty to ensure Defendant Bricktown adequately trained its employees to have the requisite knowledge of how to serve alcohol responsibly, detect signs of intoxication, recognize when intoxication has reached a dangerous level posing a threat of physical harm and death, render emergency

aid to guests suffering from medical emergencies, and call emergency medical personnel to provide proper care during a medical emergency.

93.     Defendant Marriott breached these duties to Sharon and Pauline as guests and patrons of Defendant Bricktown.

94.     Plaintiff was damaged by Defendant Marriott's negligence.

95.     Sharon's death and the damages set forth in Paragraphs 43-45 above were a direct and proximate result of Defendant Marriott's negligence.

96.     Moreover, Defendants Bricktown and Aston, because of the business relationship with Marriott, were each an ostensible agent of Defendant Marriott who therefore is vicariously liable for the negligence of Defendants Bricktown and Aston.

97.     Defendant Bricktown represented to the public that it could find a certain level of service at its hotel because it held itself out as a SpringHill Suites-brand hotel operated by Marriott.

98.     Pauline and Sharon relied on the reputation of Defendant Marriott and their personal experience with Defendant Marriott's hotels, to their detriment. Because of Defendant Bricktown's association with Defendant Marriott, Pauline and Sharon expected excellent service, a safe environment, as well as capable, knowledgeable, experienced, and well-trained employees.

99.     Because of Defendant Bricktown's trade name, "SpringHill Suites by Marriott Downtown/Bricktown," a reasonable person would think they were dealing with Defendant Marriott, and not Defendant Bricktown.

100.    Pauline and Sharon thought they were dealing with Defendant Marriott.

101.    According to the principles of ostensible agency, Defendant Marriott is vicariously liability for the negligence of Defendants Bricktown and Aston, their agents, representatives, and employees.

## JURY DEMAND

102.    Trial by jury is HEREBY DEMANDED.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff hereby prays that this Court:

A)    Enter judgment in favor of Plaintiff and against Defendants;

B)    Award Plaintiff compensatory damages in an amount in excess of $75,000 to be proven at trial;

C)    Award Plaintiff punitive damages in an amount to be determined at trial, and in an amount sufficient to punish Defendants and to deter such conduct in the future;

D)    Award Plaintiff attorney's fees, costs, prejudgment and post-judgment interest as allowed by law; and

E)    Award Plaintiff such other and further relief as the Court deems just and proper.

Respectfully submitted,


*s/Daniel G. Webber, Jr.*

Daniel G. Webber, Jr., OBA#16332
Chance L. Pearson, OBA#22269
RYAN WHALEY COLDIRON
JANTZEN PETERS & WEBBER PLLC
900 Robinson Renaissance
119 North Robinson
Oklahoma City, OK  73102
Telephone:  (405) 239-6040
Facsimile:  (405) 239-6766
Email:  dwebber@ryanwhaley.com
            cpearson@ryanwhaley.com

*Attorneys for Plaintiff*